


FILED

Aug 20 2024, 3:15 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Indiana Supreme Court

Iris Seabolt, Supreme Court Case No. 24S-PC-270,
Reginald Dillard, Supreme Court Case No. 24S-PC-271,
Leon Tyson, Supreme Court Case No. 24S-PC-272,
and Pink Allen Robinson, Supreme Court Case No. 24S-PC-273,
*Appellants*,

—v—

## State of Indiana,
*Appellee.*

---

Argued: January 25, 2024 | Decided: August 20, 2024

Appeals from the Elkhart Circuit Court
Nos. 20D03-2106-PC-19, 20D03-2207-PC-19, 20D03-1807-PC-37, 20C01-2012-PC-41

The Honorable Teresa L. Cataldo, Judge

On Petitions to Transfer from the Indiana Court of Appeals
Nos. 22A-PC-208, 23A-PC-261, 22A-PC-143, 22A-PC-1102

---

**Opinion by Justice Molter**

Chief Justice Rush, Justices Massa and Goff concur.

Justice Slaughter not participating.

**Molter, Justice.**

These four interlocutory appeals require us to decide whether a judge's decision to recuse from a prior case disqualifies her from presiding over these cases because they all present the same concerns that led her to recuse in the prior case.[1]

Andrew Royer was the petitioner in the previous case, and he sought post-conviction relief to set aside his 2005 murder conviction. He alleged that "systemic" police and prosecutorial misconduct had produced an "epidemic" of wrongful convictions in Elkhart County, including his own. Shortly after Royer first made these allegations, his attorney held a press conference amplifying them through comments that the judge concluded violated the Rules of Professional Conduct. That led the judge, who is a former Elkhart County deputy prosecutor, to not only enjoin the attorney's further public comments about the case, but also to remark that the attorney's comments were "defamatory."

Royer then argued, and the judge agreed, that the judge had to recuse for one of, or a combination of, two reasons. Royer said he would be calling many witnesses—law enforcement officers, deputy prosecutors, and an elected prosecutor—with whom the judge worked when she was a deputy prosecutor and some of whom remained the judge's social acquaintances. She could not, Royer argued, be expected to remain impartial either when evaluating so many of her friends' and former colleagues' credibility or when evaluating Royer's allegations of systemic police and prosecutorial misconduct that spanned the judge's own time as a deputy prosecutor in Elkhart County. Even if that were not reason enough to recuse, Royer also argued that the judge's characterization of

---

[1] The Court of Appeals' motions panel consolidated these appeals, and the writing panel then severed them. We heard oral argument in the Seabolt, Tyson, and Robinson appeals jointly and held the Dillard appeal, which had a later transfer request, in abeyance. We now grant transfer in all four cases and decide them through this opinion.

his attorney's comments as "defamatory" suggested she had pre-judged his allegations of systemic misconduct before hearing any evidence.

Each of the appellants here petitioned for post-conviction relief before the same judge who recused in Royer's case. Royer's attorney represents them too, and they allege the same sort of "systemic" misconduct that they claim has led to an "epidemic" of wrongful convictions. And like Royer, they intend to call as witnesses former law enforcement officers and prosecutors who are the judge's former colleagues and/or current social acquaintances.

But unlike in Royer's case, the judge declined to recuse in these cases. And as we explain below, we conclude that was a mistake. We hold that the judge is disqualified from presiding over these cases because her determination that recusal was mandatory in Royer's case would lead an objective observer to reasonably question her impartiality in these cases, where the petitioners raised the same concerns as Royer.

## Facts and Procedural History

### I. *Royer*'s Proceedings

Andrew Royer's post-conviction relief proceedings are the backdrop to these four appeals. He and Lana Canen were tried together, convicted, and sentenced to fifty-five years of incarceration for murdering Helen Sailor. *State v. Royer*, 166 N.E.3d 380, 386, 387 (Ind. Ct. App. 2021). But the State agreed to set aside Canen's conviction when she discovered new evidence proving the State's forensic expert testified falsely when he claimed that a latent fingerprint discovered at the crime scene belonged to Canen. *Id.* at 387.

Royer then sought to set aside his conviction by filing a Trial Rule 60(B) motion for relief from judgment. (He had previously exhausted his rights to a direct appeal and post-conviction relief proceedings.) And when he filed that motion, one of his attorneys held a press conference explaining Royer's allegations that the county's criminal justice system had failed

Royer. Those comments included alleging a "systemic failure and an epidemic in Elkhart County where people [were] wrongfully convicted because of police corruption, uninspiring defense counsel and an overzealous prosecutor," which the attorney said "contributed to Andrew Royer being wrongfully convicted of a murder that he [was] absolutely innocent of." App. Vol. III at 57 (quotations omitted). And he said that he had "proven that [Royer's] conviction was an absolute fraud and the conviction was based on intentional misconduct." *Id.* (quotations omitted).

The State sought to enjoin Royer's attorney from making further public comments about the case, arguing that his press conference remarks violated Indiana Professional Conduct Rule 3.6's restrictions on extrajudicial comments.[2] The judge agreed, and following a hearing, she enjoined Royer's attorney and the State "from making extrajudicial commentary and statements" about the pending proceedings. *Id.* at 59. Explaining her reasoning, the judge described the press conference comments as "highly inflammatory, defamatory, inaccurately stat[ing] the law as it exist[ed] at th[e] time with respect to Royer's conviction, and draw[ing] legal conclusions about matters not yet adjudicated." *Id.* at 57.

Shortly after, Royer withdrew his Trial Rule 60(B) motion, seeking instead permission to file a successive petition for post-conviction relief. He argued, like Canen did, that newly discovered evidence warranted setting aside his conviction. *Royer*, 166 N.E.3d at 387. And after the Court of Appeals granted his request to file a successive petition, his petition was assigned to the same judge who entered the injunction.

Royer then filed a "Motion for Recusal Pursuant to Indiana Post-Conviction Rule 1 § 4(B)." App. Vol. III at 196–204. He gave two overarching reasons. The first was that he would be calling many witnesses with whom the judge worked when she was a deputy

---

[2] The Disciplinary Commission dismissed the prosecutor's subsequent disciplinary complaint without requiring Royer's attorney to respond, concluding that the complaint did "not rais[e] a substantial question of misconduct that would warrant disciplinary action." App. Vol. IV at 26.

prosecutor and some of whom remained social acquaintances. And she could not be expected to remain impartial either when evaluating their credibility or when evaluating Royer's allegations of systemic police and prosecutorial misconduct that spanned the judge's own time as a deputy prosecutor. Second, Royer believed the judge's characterization of his attorney's comments as "defamatory" reflected that she had rejected his allegations of "system[ic]" police and prosecutorial misconduct before she heard any evidence. *Id.* at 201 (quotations omitted).

The judge granted Royer's motion, and his case was reassigned to a special judge in another county. The special judge ultimately granted Royer's successive petition for post-conviction relief, vacating his conviction. *Royer*, 166 N.E.3d at 397. The special judge concluded that many of Royer's allegations of misconduct were well-founded. *Id.* at 389–97.

A key witness in Royer's trial had been Canen's neighbor, Nina Porter, who testified that Canen had made incriminating statements to her. *Id.* at 384, 386. She also testified at trial that Royer—a severely mentally disabled individual who lived in Sailor's apartment complex—was easily influenced by Canen, which supported the State's theory that Royer was the "brawn" for Canen's plan to rob and murder Sailor. *Id.* at 383–84, 386–87, 394 (quotations omitted). But the post-conviction proceedings revealed that Porter "implicated Canen in the Sailor murder only because Detective Carl Conway threatened her with prison time and the removal of her children if she did not cooperate." *Id.* at 388. Detective Conway also "fed her information about the Sailor homicide during the unrecorded portions of the interview." *Id.* And Porter revealed that detectives notified her about a $2,000 reward that had been offered for information about the murder, with one of the detectives delivering the reward money to her following her testimony at Royer and Canen's trial. *Id.*

As for the latent fingerprint at the crime scene—which the State said in its closing argument was the "most important piece of evidence" in the case because it was the only physical evidence linking Canen to the crime (there was none linking Royer)—it belonged instead to one of Sailor's healthcare aides. *Id.* at 387 (quotations omitted). The forensic specialist

who falsely testified that the fingerprint belonged to Canen admitted his mistake years later, explaining that he didn't have the necessary training to compare latent fingerprints but felt pressured by the police department to make the comparison anyway. *Id.* at 398. And he misled the prosecutor to believe he was qualified to compare latent fingerprints, so the exculpatory and impeachment evidence of his lack of qualifications was not disclosed to the defense. *Id.* at 389.

Another key element of the prosecution was that Detective Conway testified that Royer confessed to him and shared information about the murder that had not been disclosed to the public. *Id.* at 386–87. But that evidence fell apart in the post-conviction proceedings too. The newly discovered evidence in those proceedings revealed that Detective Conway had been informed that Royer was severely disabled with "the mind of a child," yet the detective took no precautions to guard against a false confession during a two-day interrogation. *Id.* at 394. Just the opposite, he fed Royer details of the crime in an unrecorded interview before Royer then incorporated those details into his later recorded confession. *Id.* at 395–96. And another detective who observed the interrogation testified in Royer's post-conviction proceedings that it was one of the worst interrogations he witnessed in his career, including because it was "super-leading." *Id.* at 396 (quotations omitted). The State also failed to disclose that Detective Conway was removed from the homicide unit before Royer's trial because his supervisors had concerns about his past misrepresentations in another case and the potential impact those misrepresentations would have on his credibility at trials when called to testify. *Id.* at 391–92.

The petitioners here believe Royer's and Canen's exonerations are just the tip of the iceberg, and they point to other recent decisions setting aside convictions in Elkhart County, which they describe as including: the 2006 exoneration of Christopher Parish for armed-robbery and attempted murder convictions; a 2017 actual innocence pardon of Parish's codefendant, Keith Cooper; Mack Sims' 2019 exoneration for a 1993 murder after it was revealed that the police department withheld evidence that the victim only identified the shooter after being placed under hypnosis; and the Seventh Circuit's decision in 2022 granting habeas relief

to Dewayne Dunn based on ineffective assistance of counsel. *See* Lara Bazelon, *Ending Innocence Denying*, 47 Hofstra L. Rev. 393, 484 n.713, 484–85 (2018) (describing Christopher Parish's and Keith Cooper's cases and citing the National Registry of Exonerations); *Sims v. Hyatte*, 914 F.3d 1078, 1091–92 (7th Cir. 2019) (granting habeas relief); *Dunn v. Neal*, 44 F.4th 696, 706, 710 (7th Cir. 2022) (granting habeas relief).

The petitioners believe their cases reflect more of the same.

## II. These Four Appeals

### A. Petitioners' Post-Conviction Relief Allegations

#### 1. Iris Seabolt

Iris Seabolt alleges she was wrongfully convicted of the August 2000 murder of A.J. Williams. No physical evidence linked Seabolt to the crime, and her conviction, she argues, depended on witness statements that Detective Stephen Rezutko obtained. She alleges Detective Rezutko had a practice of fabricating false statements leading to wrongful convictions, and four witnesses in her case have now recanted. She says Detective John Faigh has revealed he caught Detective Rezutko providing portions of the investigative file to a jailhouse informant to fabricate a witness statement. And Detective Faigh withdrew from the investigation after his report of Detective Rezutko's misconduct didn't lead to any disciplinary action, although none of this was ever revealed to Seabolt. Detective Rezutko was also eventually forced to resign after an internal investigation concluded he paid informants and witnesses for sexual acts, and Seabolt alleges that misconduct motivated his efforts to frame her because he had a paid sexual relationship with two alternate suspects.

Seabolt also claims that multiple members of the prosecutor's office were involved in withholding exculpatory evidence, fabricating false statements, and suborning perjured testimony at her trial. And she alleges that many of the officers involved in her investigation were part of a white supremacist group of officers known as the "Wolverines," which a former

police chief has alleged formed a "code of silence" to cover up misconduct. App. Vol. VIII at 172 (quotations omitted). The judge's ex-husband was a former Elkhart Police Department reserve officer who has also corroborated some of Seabolt's allegations about the Wolverines.

### 2. Reginald Dillard

In 2000, a jury convicted Reginald Dillard of the August 1998 murder of Christopher Thomas. Like Seabolt, Dillard claims that no physical evidence tied him to the crime and that his conviction depended on witness statements that Detective Rezutko and other Elkhart County police officers allegedly coerced. He alleges this followed Detective Rezutko's practice of fabricating false statements to force wrongful convictions. Dillard also highlights Detective Rezutko's resignation due to paying informants and witnesses for sexual acts, and Dillard claims that misconduct led the detective to frame Dillard because the detective had a paid sexual relationship with a key witness against Dillard.

Dillard further alleges members of the prosecutor's office withheld exculpatory evidence and misrepresented to the jury that trial witnesses weren't receiving consideration for their testimony. The withheld exculpatory evidence allegedly included a phone call police received the day after Dillard's conviction from a woman claiming her husband and brother-in-law murdered Thomas because Thomas had acted as a police informant against her husband. Dillard also asserts many of the officers involved in his investigation were part of the Wolverines.

### 3. Leon Tyson

Leon Tyson asserts he was wrongfully convicted of the 2015 murder of Tommie Lee Strowder. As support, he alleges the State's case against him "was exceedingly thin," with eyewitness descriptions of Strowder's murderer not matching Tyson and the case revolving almost entirely around the testimony of one witness. Appellants' Br. at 16.

But now, Tyson argues, three new pieces of evidence show that someone else murdered Strowder. First, he claims a witness to Strowder's

murder provided a description of the murderer that matches the individual Tyson alleges committed the murder and does not match Tyson. Second, Tyson alleges a second witness has revealed that after the murder: (1) she saw the alternate suspect with blood on his hands; (2) the alternate suspect confessed to her; and (3) she saw and heard the alternate suspect dispose of the murder weapon and acknowledge doing so. Third, the alternate suspect allegedly confessed to his mother about committing the crime, and his mother saw him with blood on his shoes after the murder. Like Seabolt and Dillard, Tyson argues the State hid this information from him.

### 4.   Pink Allen Robinson

In 2018, after a women's clothing store in Elkhart was robbed, a jury convicted Pink Allen Robinson of three counts of robbery with a deadly weapon. Robinson argues he was wrongfully convicted, and he focuses on alleged misconduct by Detective Conway, who was the lead investigator in his case. Robinson asserts the State relied heavily on Detective Conway's credibility at trial but failed to disclose Detective Conway's disciplinary history for making misrepresentations in past cases. And he points out that Detective Conway's disciplinary history went further in his case than in Royer's because Detective Conway had also been removed from the sex crimes unit in 2012. That removal, Robinson alleges, led the prosecutor's office to state in a letter that it had lost faith in the police department and its ability to supervise its detectives and perform other police activities. Like the other petitioners, Robinson alleges all this information was withheld from him.

### B.   Petitioners' Recusal Requests

All four petitioners asked the judge to recuse from their case. Each cited Post-Conviction Rule 1(4)(b) as the basis for their request, and they gave essentially the same two overarching reasons for questioning the judge's impartiality as Royer argued.

First, they argued the judge—who was an Elkhart County deputy prosecutor from 1998 to 2002—is deeply entangled with the evidence they intend to develop and introduce. The petitioners all intend to call as witnesses many police officers and prosecutors with whom the judge worked—some of whom the petitioners believe remain the judge's social acquaintances—to prove that the petitioners' wrongful convictions resulted from what they characterize as rampant police and prosecutorial misconduct that was ongoing during the judge's time as a deputy prosecutor. The petitioners also plan to seek discovery directly from the judge and possibly call her as a witness related to her knowledge of facts surrounding Detective Rezutko's resignation, whether she was involved in a *Brady* violation that Seabolt claims contributed to her wrongful conviction, and her general knowledge of the practices in the prosecutor's office that relate to the petitioners' claims of misconduct. The petitioners anticipate calling two of the judge's Elkhart County judicial colleagues as witnesses. And they intend to call the judge's ex-husband as a witness because they claim he was a former Elkhart County reserve officer with extensive knowledge of the misconduct they allege and has provided an affidavit and recorded interview alleging systemic misconduct.

Second, the petitioners argued that in Royer's case the judge characterized their theory of the case as "defamatory," which suggests she has pre-judged their allegations of systemic misconduct leading to an epidemic of wrongful convictions before hearing any evidence.

The judge denied all four requests to recuse. As to her alleged entanglement with the petitioners' evidence, the judge explained that the simple fact that she previously worked with the witnesses while a deputy prosecutor did not require her to recuse from post-conviction proceedings involving her former office. She also concluded that her ex-husband's involvement as a witness in these cases similarly did not require recusal because the two had been divorced for almost twenty years. Most of her ex-husband's time as a reserve officer was before their marriage, and, as she saw it, his only connection to these cases was his "shared employment status many years ago with individuals [now] accused of wrongdoing." App. Vol. IX at 79 (Seabolt); App. Vol. VII at 51 (Tyson); App. Vol. X at 63

(Robinson); *see also* Supp. App. Vol. IV at 18 (Dillard) (taking judicial notice of and incorporating the court's orders in *Seabolt* and *Tyson*).

As to her comments that Royer's allegations of systemic police corruption were "defamatory," the judge explained that the petitioners misunderstood her statements. She explained that her remarks in Royer's case had nothing to do with the merits of that case but with Royer's attorney's professional conduct. She believed the attorney's remarks at the press conference violated Indiana Rule of Professional Conduct 3.6(a) because "they inaccurately stated the law as it existed at that time." App. Vol. IX at 25 (Seabolt); Supp. App. Vol. IV at 20 (Dillard); App. Vol. IV at 8 (Tyson); App. Vol. X at 60 (Robinson). And, she says, reprimanding a lawyer for what the court concluded was misconduct does not, on its own, mean the judge was biased.

After denying the requests to recuse, the judge certified each order for interlocutory review, and the Court of Appeals accepted jurisdiction. In each case, the Court of Appeals affirmed with reasoning that largely tracked the judge's reasons for denying the recusal requests. *Seabolt v. State*, No. 22A-PC-208, at *30–34 (Ind. Ct. App. Sept. 20, 2023) (mem.); *Dillard v. State*, 222 N.E.3d 338, 354–57 (Ind. Ct. App. 2023); *Tyson v. State*, 217 N.E.3d 551, 568–70 (Ind. Ct. App. 2023); *Robinson v. State*, 218 N.E.3d 17, 30–31 (Ind. Ct. App. 2023).

Now, the petitioners seek transfer, which we grant, thereby vacating the Court of Appeals' decision in each case. Ind. Appellate Rule 58(A).

## Discussion and Decision

A fair and effective judicial system requires judges who are in fact impartial and who are perceived by the public to be impartial. *See S.E. v. State*, 929 N.E.2d 1281, 1287–88 (Ind. 2010); *see also* Ind. Judicial Conduct

Rule 2.4, cmt. 1. With that in mind, we impose on judges two competing duties—a duty to preside and a duty to recuse.[3]

The default is the duty to preside. Judges are presumed unbiased, and they are required to preside over cases duly assigned to them unless their recusal is mandatory. *Zavodnik v. Harper*, 17 N.E.3d 259, 269 (Ind. 2014). That duty not only promotes efficiency by spreading cases more evenly among judges and avoiding a subsequent judge needlessly duplicating the work of a previous judge, but it also promotes public trust in our judicial system. Jud. Cond. R. 2.7, cmt. 1. Without the duty to preside, the system may appear too easily gamed. Some judges might avoid difficult or controversial cases, and the parties may seem able to delay cases unfairly through judicial disqualification or to steer their cases to judges they perceive as more favorable. *See id.*; *see also* Richard E. Flamm, *Judicial Disqualification: Recusal and Disqualification of Judges* 15 (3d ed. 2017) ("Conversely, if removing a judge were to be made too simple, both the cost of seeking justice and the delay in obtaining justice would likely soon become intolerable.").

But just as important as the duty to preside is its built-in exception: judges cannot preside over cases when recusal is mandatory. *Zavodnik*, 17 N.E.3d at 269. And recusal is mandatory when either a judge subjectively doubts their impartiality, *Voss v. State*, 856 N.E.2d 1211, 1220 (Ind. 2006), or, even if they don't, when an objective observer, familiar with all the relevant circumstances, would have a reasonable basis for doubting the judge's impartiality, *Timberlake v. State*, 753 N.E.2d 591, 610 (Ind. 2001).

These four interlocutory appeals require us to explore the interplay between the duty to preside and the duty to recuse. The petitioners argue that because the judge concluded in Royer's case that her duty to preside had to give way to her mandatory recusal based on concerns about her impartiality that persist in these cases, she should have recused in these cases too. In response, the State argues that each case must be evaluated

---

[3] In this context, we use the terms "recuse" and "disqualify" interchangeably. Ind. Judicial Conduct Rule 2.11, cmt. 1.

on its own terms, and a judge who recuses in one case isn't forever bound to reach the same conclusion in future cases, lest judges face too strong a disincentive to recuse at all. Viewed in isolation from the Royer recusal, the State doesn't believe any of these cases require recusal.

Below, we lay out the standards governing recusal decisions. And as we explain, once a judge concludes their recusal is mandatory, they must continue recusing in future cases when confronted with the same concern that led them to recuse in the prior case. That is, unless their prior recusal was mistaken or circumstances have changed so that their recusal is no longer mandatory, in which case they again have a duty to preside.

In the end, we agree with the petitioners that our holding requires us to reverse the decision declining to recuse in each case. The judge's determination that recusal was mandatory in Royer's case would lead an objective observer to reasonably question the judge's impartiality in these cases because the petitioners raised the same concerns as Royer; there is no suggestion that the judge's prior recusal was mistaken; and there has been no change in circumstances making recusal no longer mandatory.

## I.   Recusal Standards

### A.   Post-Conviction Rule 1(4)(b)

The petitioners moved for a change of judge under Post-Conviction Rule 1(4)(b). That rule requires a petitioner seeking a change of judge to file an affidavit stating "the facts and the reasons" leading the petitioner to believe "the judge has a personal bias or prejudice against" them. Ind. Post-Conviction Rule 1(4)(b). The judge must treat the affidavit's "historical facts" as true, *Pruitt v. State*, 903 N.E.2d 899, 939 (Ind. 2009) (quotations omitted), and if they "support a rational inference of bias or prejudice," then the judge must grant the motion, P-C.R. 1(4)(b). (The Code of Judicial Conduct imposes the same standard, requiring judges to disqualify themselves "in any proceeding in which the judge's impartiality might reasonably be questioned." Jud. Cond. R. 2.11(A).) Since we require the judge to accept the affidavit's historical facts as true,

we also require the petitioner's attorney—an officer of the court with a duty of candor to the tribunal—to certify that the attorney has a good-faith belief that the facts are true. P-C.R. 1(4)(b); *Brown v. State*, 746 N.E.2d 63, 70 (Ind. 2001) ("All attorneys are officers of the legal system and have a duty of candor toward tribunals."). Although judges accept the historical facts as true, judges "are not required to disqualify themselves as a result of a litigant's unfounded accusations, abusive tactics, or attempts to manipulate the system." *Zavodnik*, 17 N.E.3d at 269.

The rule only requires recusal for a "personal" bias or prejudice, P-C.R. 1(4)(b), which is one that "stems from an extrajudicial source—meaning a source separate from the evidence and argument presented at the proceedings," *Lambert v. State*, 743 N.E.2d 719, 728 (Ind. 2001). A judge is not personally biased or prejudiced merely because they have formed judgments about proceedings over which they have presided. After all, that is their job.

For example, after hearing the evidence in a criminal trial, a judge may "be exceedingly ill[-]disposed towards the defendant, who has been shown to be a thoroughly reprehensible person." *Id.* at 729 (quotations omitted). Since the judge derived that knowledge and opinion from the court proceedings, weighing those considerations when sentencing the defendant does not reflect any improper bias or prejudice. *Id.* Likewise, recusal is not required simply because the judge's opinion is based on prior proceedings over which they presided because, again, the opinion does not derive from an extrajudicial source. *Id.* Thus, for example, a post-conviction judge need not recuse merely because the judge presided over the related trial. *Id.* at 730.

When a judge is considering whether there is "a rational inference of bias or prejudice," P-C.R. 1(4)(b), they must evaluate whether "an objective person, knowledgeable of all the circumstances, would have a reasonable basis for doubting the judge's impartiality," *Timberlake*, 753 N.E.2d at 610 (quotations omitted). "This obligation to disqualify exists notwithstanding a judge's earnest, subjective belief that he or she is fully able to perform judicial duties without bias or prejudice." *Voss*, 856 N.E.2d at 1220. An objective evaluation reflects that "justice must satisfy the

appearance of justice." *Offutt v. United States*, 348 U.S. 11, 13 (1954). Of course, even if there is no objective appearance of bias or prejudice, a judge must still recuse if they subjectively believe they may not be fair and impartial. *Voss*, 856 N.E.2d at 1220 ("A judge must of course disqualify from a case upon realizing that the judge's own personal beliefs, values, or opinions are impairing his or her impartiality.").

## B.   Standard of Review

When our appellate courts review a judge's decision not to recuse, we begin by presuming the judge is not biased, *Lambert*, 743 N.E.2d at 728, and we use the same standard of review under Post-Conviction Rule 1(4)(b) as we use under Criminal Rule 2.4(B) (formerly Criminal Rule 12(B)[4]) because the rules use similar language, *Sturgeon v. State*, 719 N.E.2d 1173, 1181–82, 1182 n.5 (Ind. 1999). The parties agree with that much, but they disagree about which standard those rules require, although really, they just have different ways of saying the same thing.

We've said that under both Post-Conviction Rule 1(4)(b) and Criminal Rule 2.4(B) we review for clear error, *Azania v. State*, 778 N.E.2d 1253, 1261 (Ind. 2002), so that is the standard the State urges us to apply. But when explaining that standard, we've also said that a motion for change of judge "calls for a legal determination" and the relief is "neither automatic nor discretionary," *Sturgeon*, 719 N.E.2d at 1181 (quotations omitted). We generally review legal conclusions de novo, so the petitioners urge de novo review rather than clear error review. *Horton v. State*, 51 N.E.3d 1154, 1157 (Ind. 2016).

Further to the petitioners' point, Post-Conviction Rule 1(4)(b) requires the judge to treat the historical facts in the petitioner's affidavit as true. *Pruitt*, 903 N.E.2d at 939. And when judges reach legal conclusions based on undisputed facts or facts they must assume true—like when deciding a

---

[4] Effective January 1, 2024, Criminal Rule 12(B) was amended and renumbered as Criminal Rule 2.4(B).

Trial Rule 12 motion to dismiss or a Trial Rule 56 summary judgment motion—we generally review those decisions de novo. *Safeco Ins. of Ind. v. Blue Sky Innovation Grp., Inc.*, 230 N.E.3d 898, 901 (Ind. 2024) (motion to dismiss); *Performance Servs., Inc. v. Randolph E. Sch. Corp.*, 211 N.E.3d 508, 511 (Ind. 2023) (summary judgment).

We can reconcile the notion that we are reviewing a legal determination with a "clear error" standard of review by, as the State correctly explains, invoking our precedent that misapplying the law to properly found facts is clear error, "and in that situation we do not defer to the trial court." *State v. Van Cleave*, 674 N.E.2d 1293, 1296 (Ind. 1996). So even though the two sides affix different labels—the petitioners call our review "de novo" and the State calls it "clear error"—both sides appropriately agree we don't afford any deference to the judge's evaluation of whether an objective observer would reasonably doubt the judge's impartiality based on the facts that the judge must accept as true.

In these cases, there is no material dispute about the facts that the judge had to accept as true. Instead, the disagreement is how to apply the legal standard to the facts, assessing whether an objective person, knowledgeable of all the circumstances, would have a reasonable basis for doubting the judge's impartiality in these cases. We turn to that assessment next.

## II. Application of Standards in These Cases

The petitioners here all asked the judge to recuse for largely the same two reasons Royer did, and they believe their arguments are even stronger than Royer's. Because the judge granted Royer's motion, and because we see no reason for treating these cases differently, we conclude that the judge was required to recuse in these cases too.

### A. Royer's Motion

To recap, Royer's two reasons for asking the judge to recuse were: (1) she was too deeply entangled in the evidence, and (2) the judge already

expressed an opinion on the merits of his claim without hearing evidence when she described his attorney's comments as "defamatory."

Critical here, the judge granted Royer's motion for recusal. She didn't explain her recusal decision when she made it, but she had a duty to remain on the case unless recusal was mandatory. So we understand her decision to mean she concluded she needed to recuse. *Zavodnik*, 17 N.E.3d at 269 (explaining that "judges have an affirmative duty to preside over cases unless disqualification is mandatory"). And recusal was only mandatory in Royer's case if (a) the judge subjectively believed she could not be fair and impartial, *Voss*, 856 N.E.2d at 1220, or (b) "an objective person, knowledgeable of all the circumstances, would have a reasonable basis for doubting the judge's impartiality," *Timberlake*, 753 N.E.2d at 610 (quotations omitted). By recusing, the judge necessarily concluded either she could not be impartial, or that her connections to the allegations and witnesses in the case and/or her prior statement about Royer's allegations would lead an objective observer to reasonably doubt her impartiality.

## B. Petitioners' Arguments

The petitioners here contend that Royer's two successful arguments are even stronger in their cases. They argue the judge's entanglement with the petitioners' evidence has only deepened. Not only will they, like Royer, call many witnesses who were the judge's former colleagues to prove systemic misconduct that the petitioners allege spanned the judge's own time as a deputy prosecutor, they now intend to at least seek discovery from the judge, and they may call her as a witness. They also intend to call as witnesses two of her Elkhart County judicial colleagues and her ex-husband.

The petitioners also argue that the other reason Royer proposed for recusal—the judge's characterization of his theory of the case as "defamatory"—persists in these cases as well, which they believe is especially problematic because the judge is the fact finder. *See Hadler v. Union Bank & Tr. Co. of Greensburg*, 765 F. Supp. 976, 979 (S.D. Ind. 1991) (explaining that recusal obligations become "incrementally more stringent when the judge becomes the fact-finder"). The State acknowledges that

these petitioners allege the same systemic misconduct leading to what they characterize as an epidemic of wrongful convictions that Royer alleged. Appellee's Br. at 19 ("Just as in *Royer*, Petitioners assert a similar claim alleging a systemic failure of the EPD and ECPO resulting in their wrongful convictions.").

For example, like Royer, they all allege *Brady* violations. Seabolt and Dillard, like Royer, allege that members of the Elkhart Police Department fabricated witness statements. Seabolt, Dillard, and Robinson allege that the police department and prosecutor's office failed to disclose significant disciplinary history of the detectives who led the investigations of their cases, just as Royer claimed. Robinson alleges that the same prosecutor failed to disclose evidence of the same significant disciplinary history of the same officer that Royer alleged. And also like Royer, Dillard and Tyson allege that the State failed to disclose evidence of alternate suspects in their cases.

## C.   Judge's Reasons for Declining to Recuse

Having recused in Royer's case, the petitioners argued the judge should recuse in their cases too. But she declined, and the State agrees with that decision. As for her relationships with the likely witnesses, the judge concluded that the mere fact that she previously served as a deputy prosecutor working with the witnesses does not require her to recuse from post-conviction proceedings challenging the convictions her former office secured, especially because she was not involved in prosecuting any of these petitioners. She found it inconsequential that the petitioners would be calling as witnesses two of her Elkhart County judicial colleagues because they do not preside in her court. And she concluded her ex-husband's involvement as a witness in these cases did not require recusal because they had been divorced for almost twenty years; most of his time as a reserve officer was before their marriage; and she believed his only connection to these cases was his "shared employment status many years ago with individuals accused of wrongdoing." App. Vol. IX at 79 (Seabolt); App. Vol. VII at 51 (Tyson); App. Vol. X at 63 (Robinson); *see also*

Supp. App. Vol. IV at 18 (Dillard) (taking judicial notice of and incorporating the court's orders in *Seabolt* and *Tyson*).

As for her statement that Royer's allegations of systemic abuse were "defamatory," she explained the petitioners misunderstood what she was saying. She says she wasn't expressing an opinion about whether Royer's allegations were true. She was instead explaining that the statements Royer's attorney made at the press conference violated Indiana Rule of Professional Conduct 3.6(a) because "they inaccurately stated the law as it existed at that time." App. Vol. IX at 25 (Seabolt); Supp. App. Vol. IV at 20 (Dillard); App. Vol. IV at 8 (Tyson); App. Vol. X at 60 (Robinson). And, she says, reprimanding a lawyer for what the court concluded was misconduct does not, by itself, mean the judge was biased.

## D.  Applying an Objective Observer Standard to These Cases

We agree with the broad propositions that the judge stated and that the State argues. The mere fact that a judge previously served as a prosecutor or deputy prosecutor does not mean they must recuse from all cases involving their former office or people they worked with in that office. *See Rankin v. State*, 563 N.E.2d 533, 536 (Ind. 1990) (holding that the defendant was not entitled to a change of judge where the trial judge was a former prosecutor who signed the information alleging a felony that was the basis for a habitual offender finding because there was no factual dispute about the prior conviction); *Dishman v. State*, 525 N.E.2d 284, 285 (Ind. 1988) (holding that the defendant was not entitled to a change of judge where the trial judge was a former prosecutor who secured convictions underlying a habitual offender finding because there was no "factual contesting" of the prior convictions); *Broome v. State*, 687 N.E.2d 590, 596–97 (Ind. Ct. App. 1997) (holding that the defendant was not entitled to a change of judge where the judge, as a former prosecutor, hired, trained, and supervised the prosecutor on the defendant's case and had counseled and trained many local law enforcement officers), *summarily aff'd in relevant part by* 694 N.E.2d 280, 281 (Ind. 1998); *see generally* Wayne R.

LaFave et al., 6 *Crim. Proc.* § 22.4(c) n.46 (4th ed. 2023) (collecting authority).

Relatedly, "[t]he fact that an adjudicator happens to be socially acquainted or even friends with a party, attorney, witness or other person" does not, by itself, "ordinarily supply a litigant with a cognizable basis for questioning the ability of that judge to be impartial in presiding over that proceeding." Flamm, *supra*, at 461; *accord L.G. v. S.L.*, 88 N.E.3d 1069, 1073 (Ind. 2018) ("Just as 'friendship' alone may not be enough to require recusal (in some cases, it could be), neither does professional admiration always demand recusal."). The State is also correct that our trial courts must "routinely sit[ ] in [judgment] of allegations that the prosecutors and/or the police in their county have committed some act or omission that renders evidence inadmissible or jeopardizes the validity of a conviction," and those judges should not recuse merely because they have worked in some capacity with those prosecutors or officers before. Appellee's Br. at 26. And we agree with the judge and the State that a judge's statement that counsel's conduct in a case over which the judge is presiding violates the Rules of Professional Conduct does not, by itself, require recusal either. *See State ex rel. Allen v. Carroll Cir. Ct.*, 226 N.E.3d 206, 217–18 (Ind. 2024) (holding that the judge's conclusion that counsel's representation reflected "gross negligence" did not require recusal (quotations omitted)).

But these appeals can't be decided on those broad propositions. What is different about these appeals—and this is critical to our holding—is that the judge already decided in Royer's case that recusal was *mandatory*. So while viewing each of the petitioners' various concerns in isolation may not warrant recusal, the judge herself already concluded that their overarching concerns about her entanglement with the evidence and her remark about their attorney's comments do require recusal. And an objective observer who knows the judge previously concluded she had a duty to recuse could thus reasonably doubt her impartiality in these cases. That objective observer could reasonably ask: What changed since the judge decided she was required to recuse in Royer's case? And the record does not reveal a good answer.

Indeed, the judge's orders in these cases acknowledge they should be consistent with one another. The order in *Tyson* explained that the judge rejected the same arguments for recusal in *Robinson*, and "[a]ssuredly, the outcome should be the same here." App. Vol. VII at 46. In *Robinson*, the judge said the court "summarily adopts its previous findings in *Tyson* and *Seabolt* that this Court's prior employment does not create a question of impartiality such that the Court should be expected to recuse in this case." App. Vol. X at 62. And in *Dillard*, the judge took judicial notice of the *Tyson* and *Seabolt* orders and incorporated their reasoning. Supp. App. Vol. IV at 18.

We agree that recusal decisions should be consistent, and that is the problem with declining to recuse in these cases after deciding that recusal was mandatory in Royer's case. Of course, a prior recusal decision matters only when a later case presents the same material concerns. So, for example, a judge's recusal from a case involving a party the judge previously represented in the same or a related matter does not necessarily require the judge to recuse from another "factually and legally unrelated proceeding" involving that same party. *Mathews v. State*, 64 N.E.3d 1250, 1256 (Ind. Ct. App. 2016), *trans. denied*. But the petitioners here did all present the same material concerns that led the judge to recuse in Royer's case.

And to be sure, the State is correct that a judge's decision to recuse in one case does not mean the judge is locked into that position and must forever recuse whenever related circumstances arise again. The passage of time, reconsideration of the prior recusal decision, or other new considerations may reasonably lead the judge to decide not to recuse in a later case that presents circumstances related to a prior recusal. For example, personal animosity between a judge and an attorney may dissipate over time, making it appropriate for the judge to recuse from the attorney's earlier cases but not later ones. *See Selkridge v. United of Omaha Life Ins.*, 360 F.3d 155, 170 (3d Cir. 2004) ("We further agree with Judge Moore that the passage of time does, indeed, heal wounds, and we do not mean to suggest that it is not presently appropriate for him to sit on cases involving Attorney Rohn."). As another example, while there is no presumption of bias when a former law clerk or law partner appears

before a judge, "some judges have informally adopted a policy of recusing themselves from all such matters *for a period of time*." Flamm, *supra*, at 477 (emphasis added). But even though a judge recuses in some cases involving those colleagues, the judge may reasonably conclude that enough time has passed that recusal is no longer appropriate. *Id.* at 471 ("Judges have sometimes recused themselves in such situations – at least for a certain period of time following their ascension to the bench. However, a judge is not necessarily disqualified from presiding over matters involving her former legal colleagues after that time period has expired.").

Here, there is no suggestion that the judge's recusal in Royer's case was mistaken. That was not a case where the judge was merely a former coworker of deputy prosecutors and law enforcement officers in the case before her. The many witnesses who were her former colleagues would be providing evidence related to Royer's allegations of systemic police and prosecutorial misconduct that he claimed covered the judge's own time in the prosecutor's office. And an objective observer could reasonably consider that context when interpreting the judge's remark that the comments by Royer's attorney about alleged systemic misconduct were "defamatory." *See Thakkar v. State*, 644 N.E.2d 609, 611 (Ind. Ct. App. 1994) (reversing a criminal sentence based on the judge's decision declining to recuse after making remarks "clearly bring[ing] into question the trial court's objectivity in the matter").

There is also no evidence in the record before us of changed circumstances since the judge concluded she needed to recuse in Royer's case based on the same concerns the petitioners raise here, other than circumstances that further weigh in favor of recusal. *Cf. Selkridge*, 360 F.3d at 170 (holding that a trial judge "cannot, without explanation," recuse from one group of cases while, at the same time, declining to recuse "in another group of cases that appears indistinguishable for purposes of recusal"). Most importantly, the judge's entanglement with the evidence has only deepened. And even if those new developments do not independently warrant recusal, they do nothing to eliminate the concerns that led the judge to recuse in Royer's case.

The judge dismissed the argument that her recusal in Royer's case should compel her to recuse in these cases too by saying she only recused in Royer's case to "cure any lingering concerns." App. Vol. IX at 28 (Seabolt); App. Vol. IV at 10 (Tyson). But she did not explain what those lingering concerns were and why they no longer linger. Nor is it apparent to us. So an objective observer could reasonably persist in doubting the judge's impartiality in these cases based on her own conclusion in Royer's case that there were reasonable questions about her impartiality.

Thus, the judge needed to continue recusing in these cases until there was some change in circumstances that would no longer lead an objective observer to reasonably question her impartiality.

## Conclusion

For these reasons, we reverse the trial court's order denying the petitioner's motion for recusal in each case and remand with the instruction to grant the motions.

Rush, C.J., Massa and Goff, JJ., concur.
Slaughter, J., not participating.

ATTORNEYS FOR APPELLANT IRIS SEABOLT

Jimmy Gurule

Kevin J. Murphy

Exoneration Justice Clinic

Notre Dame Law School

South Bend, Indiana

Elliot Slosar

The Exoneration Project

Chicago, Illinois

Robert Hochman

Sidley Austin LLP

Chicago, Illinois

ATTORNEYS FOR APPELLANT REGINALD DILLARD

Jimmy Gurule

Kevin J. Murphy

Exoneration Justice Clinic

Notre Dame Law School

South Bend, Indiana

Elliot Slosar

The Exoneration Project

Chicago, Illinois

ATTORNEYS FOR APPELLANT LEON TYSON

Mark A. Bates

Law Offices of Mark A. Bates

Highland, Indiana

Jimmy Gurule

Kevin J. Murphy

Exoneration Justice Clinic

Notre Dame Law School

South Bend, Indiana

Elliot Slosar

The Exoneration Project

Chicago, Illinois

Robert Hochman
Sidley Austin LLP
Chicago, Illinois

ATTORNEYS FOR APPELLANT PINK ALLEN ROBINSON
Jimmy Gurule
Kevin J. Murphy
Exoneration Justice Clinic
Notre Dame Law School
South Bend, Indiana

Elliot Slosar
The Exoneration Project
Chicago, Illinois

Robert Hochman
Sidley Austin LLP
Chicago, Illinois

ATTORNEYS FOR APPELLEE STATE OF INDIANA
Theodore E. Rokita
Kelly A. Loy
Office of the Attorney General
Indianapolis, Indiana